UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

TERRI NORMAN,

           Plaintiff,

    v.

NANCY BERRYHILL,

           Defendant.

Case No. 17-cv-04108-SI

**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 19, 23

The parties have filed cross-motions for summary judgment in this Social Security appeal. Dkt. Nos. 19, 23. Having considered the parties' papers and the administrative record, the Court hereby GRANTS IN PART and DENIES IN PART plaintiff's motion for summary judgment, and DENIES defendant's cross-motion for summary judgment. The matter is REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this Order.

**BACKGROUND**

**I.      Procedural History**

In August 2013, plaintiff Terri Norman applied for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. Administrative Record ("AR") at 17, 173. She alleged a disability onset date of January 1, 2009, based on depression. *Id.* at 221. Her applications were denied originally and upon reconsideration. *Id.* at 61, 72. Plaintiff's applications were then heard by Administrative Law Judge ("ALJ") Richard P. Laverdure at a video hearing on November 18, 2015. *Id.* at 17. The ALJ denied plaintiff's claims in a decision dated December 11, 2015, finding

United States District Court
Northern District of California

that she was not disabled prior to or on December 31, 2014, the last date she was insured.[1] *Id.* at 26.

The Appeals Council denied review of plaintiff's claims on May 24, 2017, rendering ALJ Laverdure's denial the final decision of the Commissioner. *See id.* at 1-3. On July 20, 2017, plaintiff, appearing pro se, filed this action for judicial review pursuant to 42 U.S.C. § 405(g). Dkt No. 1. After plaintiff missed the deadline to file her motion for summary judgment or remand, plaintiff obtained representation. Following numerous requests for extensions of time and an order to show cause, plaintiff filed her motion for summary judgment on May 25, 2018. *See* Dkt. No. 19. Defendant then sought and received several extensions of time to file her cross-motion for summary judgment, which she filed on July 27, 2018. *See* Dkt. No. 23. Plaintiff did not file a reply brief.

## II.    Work and Medical History

At the time of the administrative hearing, plaintiff was a 46-year-old woman with some college education. AR at 24. She had previously worked as a customer service representative for the IRS since the early 1990's and then for the Social Security Administration beginning in August 2006. *Id.* at 43-44. In August 2008, plaintiff was terminated from her employment with the Social Security Administration, in what the ALJ described as a "very unpleasant experience" in which plaintiff was given no notice prior to termination and was publicly escorted from the premises by a security officer. *Id.* at 38, 309, 312. She has described the event as "humiliating." *Id.* at 312, 333. Since this termination, plaintiff has been diagnosed with major depression and post-traumatic stress disorder ("PTSD"). *See, e.g., id.* at 312, 345, 407. Plaintiff also has a history of gastritis, hypertension, hyperlipidemia, prediabetes, and morbid obesity. *Id.* at 312.

Following her termination, plaintiff initially attempted to find a new job but was unsuccessful. *Id.* at 38-39. She first sought psychiatric treatment in January 2009. *Id.* at 293.

---

[1] To qualify for DIB (Title II benefits), a claimant must demonstrate that he or she was disabled prior to the last insured date, which is referred to as Date Last Insured ("DLI"). *See Armstrong v. Comm'r of Soc. Sec. Admin.*, 160 F.3d 587, 589 (9th Cir. 1998) (citing 42 U.S.C. § 423(c)).

Plaintiff attempted to return to work in 2010 but only worked for about a month, at a bank. *Id.* at 174, 177, 222.

### III.     Medical and Vocational Evidence

Plaintiff's medical records include treatment notes and assessments from numerous providers at Kaiser Permanente, including therapist Cheri Coulter, L.C.S.W., who treated plaintiff beginning on November 6, 2014, and Dr. Purvi Sangani, M.D., who treated plaintiff in February and June 2015. In addition to reviewing treatment records, the ALJ considered the opinions of three non-treating practitioners: Dr. Patricia Spivey, Psy.D., of the Pacific Health Clinic, who conducted a consultative exam in October 2013; Dr. Martin Koretzky, Ph.D., a state agency non-examining doctor who reviewed plaintiff's claim at the initial review stage in November 2013; and Dr. Elizabeth Covey, Psy.D., a state agency non-examining doctor who reviewed plaintiff's claim at the reconsideration stage in February 2014.

#### A.      Treating Providers

Beginning January 27, 2009, plaintiff began seeking treatment from the Kaiser Permanente department of psychiatry. *See id.* at 309. Over the years, she would see a number of providers there, for varying periods of time, sometimes with lengthy gaps between services. In February 2009, plaintiff had two appointments with Elizabeth Colt, L.C.S.W. Ms. Colt diagnosed plaintiff with "depression, major, single episode, complete remission." *Id.* at 311. She noted that plaintiff had been symptomatic ever since her dismissal from her job in August 2008. *Id.* at 312. She noted that plaintiff "complains of depression including depressed mood, crying spells, hypersomnia, irritability, decreased energy and worry, feelings of worthlessness, decr[eased] joy and participation in interests. She [states] that if it weren't for her husb[and] and kids, she might be in bed or at home, inactive." *Id.* The mental status exam that Ms. Colt performed at their first meeting was normal except that plaintiff's behavior was tearful, her mood depressed and sad, and her affect "mood congruent." *Id.* at 313. A gap in the treatment notes resumes in November 2009,

when plaintiff called Ms. Colt after her husband suddenly left her and moved out of state.[2]  *Id.* at 317.  The notes from a follow-up phone appointment five days later indicate that plaintiff did not attend the crisis group meeting to which she was referred and that she "fears coming for psych help" due to worries of her husband using the information in a child custody dispute.  *Id.* at 319.  Plaintiff participated in two additional phone sessions and one in-person session with Ms. Colt.  *See id.* at 321, 323, 325.  On March 9, 2010, Ms. Colt noted that plaintiff "has been seriously depressed for over a year now, has a PHQ9[3] today of 21, and just today accepted my suggestion that she consider an anti-depressant."  *Id.* at 325.  Her symptoms included poor sleep (about four to five hours, disrupted, nightly), poor appetite, weight loss, and decreased energy, interest, and concentration.  *Id.* at 326.  On March 30, 2010, plaintiff attended one session of Kaiser's "Black Women's Support Group."  *Id.* at 328.  Plaintiff did not return to the group, reporting to a later therapist "that the women in the group minimized her experience and invalidated her feelings."  *Id.* at 333.  Plaintiff also did not see Ms. Colt again.

There is a gap in the treatment records from March 30, 2010, to April 23, 2013, when plaintiff contacted the psychiatry department.  *See id.* at 329-30.  She explained to the intake doctor that she did not continue her treatment before because she "did not feel comfortable with therapist or group."  *Id.* at 330.  On May 2, 2013, plaintiff had one office visit with Dr. Stephanie Shippen, Psy.D., a psychologist trainee.  *Id.* at 332.  Plaintiff recounted the experience of being terminated from her job in 2008, stating (according to Dr. Shippen's notes) that "she replays the experience over in her mind on a regular basis.  She is upset that people think she did something illegal, and she feels judged by others.  She discussed her feelings about this injustice and discussed the injustices and discrimination that African American people face."  *Id.* at 333.  She also "stated that her former therapist made a racist comment ('aren't you used to being treated this

---

[2] The couple later reconciled.

[3] The Patient Health Questionnaire known as the "PHQ-9" "is a[n] instrument for making criteria-based diagnoses of depressive and other mental disorders commonly encountered in primary care."  Kurt Kroenke, MD, et al., *The PHQ-9: Validity of a Brief Depression Severity Measure*, 16 J. Gen. Intern. Med. 606 (2001).  A score of 21 correlates to a "severe" level of depression.  *Id.* at 611.

way?'), and then referred her to an African American women's support group." *Id.* Plaintiff "expressed concern about [Dr. Shippen's] status as psych assistant and said she did not want to be judged." *Id.* at 334. Dr. Shippen diagnosed plaintiff with major depression, recurrent, and anxiety. *Id.* at 335. Plaintiff did not see Dr. Shippen again.

On August 7, 2013, plaintiff came in for an urgent crisis appointment with Dr. Tescia Evans, Ph.D., after expressing thoughts of harming herself, apparently triggered by her visit to a Social Security office to apply for benefits. *Id.* at 343, 345-46, 353. Dr. Evans noted that plaintiff "appears to be having a difficult time moving forward from the incident that occurred at work" but found that immediate hospitalization was not warranted. *Id.* at 347. She referred plaintiff to a follow-up appointment within one week. *Id.* at 348.

On August 13, 2013, plaintiff missed her intake appointment with Tonya Gulbranson, L.C.S.W. *Id.* at 350. She appeared for her intake the following week, on August 20, 2013. Plaintiff reported that she returned to treatment "at the urging of her friend" and that she "[h]as felt let down by [treatment] in the past and has a prob[lem] trusting people." *Id.* at 354. Plaintiff was "reluctant to try meds and groups" and "isolates and rarely leaves home." *Id.* Ms. Gulbranson's notes from that meeting contain a note from Lisa Galan de Martinez, BMS, who saw plaintiff during the crisis appointment on August 7. These notes state that plaintiff "has declined medication as she worries about being addicted and because of the stigma mental health has in her family and African American community."[4] *Id.* at 353. It also states, "patient has information re: anti-depressants which clearly states and I reiterate non addictive medication." *Id.* Ms. Gulbranson diagnosed plaintiff with anxiety disorder, rule-out PTSD, occupational problems, and major depression, recurrent. *Id.* at 363.

Plaintiff saw Ms. Gulbranson for two follow-up appointments, on October 1 and November 5, 2013. At the November appointment, Ms. Gulbranson noted that plaintiff had attended two depression classes and then stopped. *Id.* at 393. Plaintiff could not say why "except

---

[4] The medical records provided do not contain the original notes from Ms. Galan de Martinez. They appear only as they have been copied into the August 20, 2013 treatment notes of Ms. Gulbranson.

that she did not feel comfortable." *Id.* The treatment notes report that plaintiff "was very guarded at session. Would not look at me and would hardly speak." *Id.* The mental status examination was normal, except that plaintiff's behavior was "very guarded, poor eye contact," her demeanor/manner was "guarded, withdrawn," her speech was "terse" and her mood was "depressed, appeared irritable." *Id.* Plaintiff was "non-committal" about booking a future appointment. *Id.* Ms. Gulbranson opined, "In my clinical opinion, I feel there may have been attempts at testing whether or not I would abandon her." *Id.* Ms. Gulbranson then concluded that plaintiff was "ambivalent about all treatment at this time" and terminated treatment. *Id.* at 394.

Plaintiff did not return for psychiatric services until she saw Cheri Coulter, L.C.S.W., on November 6, 2014, after initially going to Kaiser for care for her son. *See id.* at 405. Plaintiff told Ms. Coulter that she "has been dealing with feeling unable to go out in the world, work or enjoy life outside herself. It takes an incredible amount of effort to go out among people . . . ." *Id.* Plaintiff stated that she was not open to therapy: "Her experience when she sought help before [was that] she was judged and told to get over it. She also has a fear of just being referred to a group, when she doesn't feel safe anyway[.]" *Id.* Plaintiff and Ms. Coulter discussed the termination incident in 2008. *Id.* at 405-06. Plaintiff then had follow-up telephone appointments with Ms. Coulter on November 20, December 8, December 16, and December 26, 2014. *Id.* at 409, 411, 413, 415. Ms. Coulter initially diagnosed plaintiff with major depression, recurrent, and then with PTSD. *See id.* at 409, 413. Plaintiff continued to have regular appointments with Ms. Coulter continuing at least through late September 2015, when the medical records that are part of the administrative record here end.

On January 16, 2015, Ms. Coulter wrote a letter for plaintiff's DIB application. *Id.* at 397. The body of the letter reads, in full:

> I am writing this letter at the request of Mrs. Norman. Mrs. Norman has sought services to address continuing struggle with symptoms of depression, hopelessness, anxiety and inability to manage daily life. Mrs. Norman has been diagnosed with Major Depression and PTSD. Her condition and symptoms have greatly impacted her daily living and functioning over the past 6 years[,] preventing her from being able to get back into the work force. Because of the length of time and the chronicity of her symptoms it is not likely that she will be able to work in the for seeable [sic] future.

*Id.*

On February 19, 2015, Ms. Coulter completed a Mental Impairment Questionnaire. *Id.* at 398. The questionnaire was co-signed by Dr. Purvi Sangani, M.D., who reviewed and signed the paperwork that Ms. Coulter completed. *Id.* at 439. The questionnaire lists plaintiff's diagnoses as Major Depression and PTSD. *Id.* at 398. It states that plaintiff "has demonstrated depression and anxiety and found it difficult to engage in therapy. Multiple things seem to trigger memories of the firing experience and she finds it hard to feel safe or to trust." *Id.* When asked for a prognosis, Ms. Coulter wrote, "Given multiple efforts to engage in therapy and dropping out along with not being able to re-engage in getting back into the work force over [the] last 5-6 years, prognosis is guarded." *Id.*

The questionnaire lists plaintiff as "unable to meet competitive standards" in the areas of: maintaining regular attendance and being punctual; completing a normal workday and workweek without interruptions from psychologically based symptoms; accepting instructions and responding appropriately to criticism from supervisors; dealing with stress of semiskilled and skilled work; interacting appropriately with the general public; and maintaining socially appropriate behavior. *Id.* at 400-01. The questionnaire lists plaintiff as having marked limitations in activities of daily living and social functioning; moderate limitation in maintaining concentration, persistence, or pace; and no limitation in terms of prior episodes of decompensation. *Id.* at 402. The questionnaire states that plaintiff would be absent from work more than four days per month and would be unable to complete a work-day more than four days per month. *Id.* at 403. When asked whether plaintiff's impairment has lasted or can be expected to last at least twelve months, Ms. Coulter checked "yes." *Id.*

Dr. Sangani saw plaintiff separately on two occasions: first, for an office visit on February 19, 2015, the same day that Dr. Sangani co-signed the Mental Impairment Questionnaire that Ms. Coulter completed; and second, for a telephone appointment on June 10, 2015, when Ms. Coulter was out of the clinic. *Id.* at 439-40, 464-65.

### B.     Examining Physician

Dr. Patricia Spivey, Psy.D., of the Pacific Health Clinic conducted a consultative exam in October 2013. *Id.* at 365-68. Her report notes that plaintiff stated her termination from her job "caus[ed] her to have an episode of depression that is still ongoing. She sobbed uncontrollably in giving the circumstances of being fired." *Id.* at 366. Dr. Spivey gave the following prognosis: "She would probably do better on a medication; however, she has been resistant to trying it. Her social support is good, so she could probably overcome this episode with some good treatment." *Id.* at 367. Dr. Spivey recorded the following diagnostic impressions: depressive disorder NOS and rule out personality disorder NOS. *Id.* at 366. Dr. Spivey assessed plaintiff as having mild impairment in her ability to maintain adequate pace or persistence to complete 1-2 step simple repetitive tasks and to maintain adequate attention/concentration. *Id.* at 367. Dr. Spivey assessed plaintiff as having moderate impairment in her ability to maintain adequate pace or persistence to complete complex tasks; adapt to changes in job routine; withstand the stress of a routine work day; maintain emotional stability/predictability; or interact appropriately with co-workers, supervisors and the public on a daily basis. She found plaintiff would have no impairment in the ability to follow simple or complex instructions or to communicate effectively either verbally or in writing. *Id.*

### C.     Reviewing Physicians

Dr. Martin Koretzky, Ph.D., the state agency's medical consultant, reviewed plaintiff's file for her disability claim at the initial level and performed a mental residual functional capacity assessment. Dr. Koretzky diagnosed plaintiff with affective (mood) disorder. *Id.* at 50. In a determination dated November 8, 2013, Dr. Koretzky considered medical records from Kaiser Permanente as well as Dr. Spivey's consultative examination. *Id.* at 52-53, 61. Dr. Koretzky accorded "great weight" to Dr. Spivey's evaluation and did not address the weight accorded to the Kaiser Permanente records.[5] *See id.* at 57. Dr. Koretzky found plaintiff to be moderately limited

_____

[5] Dr. Koretzky's determination wrongly describes Dr. Spivey's Pacific Health Clinic consultative evaluation as coming from a "Treating Source." *See* AR at 52. This error persisted

8

in her ability to understand and remember detailed instructions, explaining that "[s]he is capable of understanding and remembering 1-2 step instructions, but would have some difficulty with 3-4 step instructions." *Id.* at 58. Dr. Koretzky found plaintiff was moderately limited in her ability to perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. *Id.* Dr. Koretzky explained that plaintiff "is capable of maintaining a schedule and completing a workweek at a consistent pace for simple tasks." *Id.* He also opined that plaintiff was moderately limited in her ability to interact appropriately with the general public, finding that "[s]he is capable of interacting superficially with the public." *Id.* at 59.

On February 15, 2014, Dr. Elizabeth Covey, Psy.D., another state agency non-examining doctor, completed a review of plaintiff's file upon reconsideration, also performing a mental residual functional capacity assessment. Like Dr. Koretzky, Dr. Covey gave "great weight" to the examination by Dr. Spivey. *Id.* at 68. Dr. Covey found the same areas of moderate limitation as Dr. Koretzky. *See id.* at 69-70. In addition, Dr. Covey found plaintiff to be moderately limited in her ability to understand and remember detailed instructions and in her ability to respond appropriately to changes in the work setting. *Id.* Dr. Covey found that plaintiff "appears capable of interacting appropriately w[ith] supervisors & of superficial interaction w[ith] coworkers. Suggested environment that does not require frequent/ongoing interaction with the public." *Id.* at 70.

## LEGAL STANDARD

### I. Standard of Review

The Social Security Act authorizes judicial review of final decisions made by the Commissioner. 42 U.S.C. § 405(g). Here, the decision of the ALJ stands as the final decision of the Commissioner because the Appeals Council declined review. 20 C.F.R. § 416.1481. The

---

through the reconsideration level. *See id.* at 65, 68.

1    Court may enter a judgment affirming, modifying or reversing the decision of the Commissioner,

2    with or without remanding the case for a rehearing.  42 U.S.C. § 405(g).

3         Factual findings of the Commissioner are conclusive if supported by substantial evidence.

4    *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2001).  The Court may set

5    aside the Commissioner's final decision when that decision is based on legal error or where the

6    findings of fact are not supported by substantial evidence in the record taken as a whole.  *Tackett*

7    *v. Apfel*, 180 F.3d 1094, 1097-98 (9th Cir. 1999).  Substantial evidence is "more than a mere

8    scintilla but less than a preponderance."  *Id.* at 1098.  Substantial evidence means "such relevant

9    evidence as a reasonable mind might accept as adequate to support a conclusion."  *Molina v.*

10   *Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012) (internal quotation marks and citations omitted).  To

11   determine whether substantial evidence exists, the Court must consider the record as a whole,

12   weighing both evidence that supports and evidence that detracts from the Commissioner's

13   conclusion.  *Tackett*, 180 F.3d at 1098.  "Where evidence is susceptible to more than one rational

14   interpretation," the ALJ's decision should be upheld.  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th

15   Cir. 2005).

16        "When the ALJ denies benefits and the court finds error, the court ordinarily must remand

17   to the agency for further proceedings before directing an award of benefits."  *Leon v. Berryhill*,

18   880 F.3d 1041, 1045 (9th Cir. 2017) (citing *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d

19   1090, 1099 (9th Cir. 2014)).  However, under the credit-as-true rule, the Court may order an

20   immediate award of benefits if three conditions are met.  First, the Court asks "whether the 'ALJ

21   failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or

22   medical opinion.'"  *Id.* (quoting *Garrison v. Colvin*, 759 F.3d 995, 1020 (9th Cir. 2014)).  Second,

23   the Court must "determine whether there are outstanding issues that must be resolved before a

24   disability determination can be made, . . . and whether further administrative proceedings would

25   be useful."  *Id.* (internal quotation marks and citations omitted).  Third, the Court then "credit[s]

26   the discredited testimony as true for the purpose of determining whether, on the record taken as a

27   whole, there is no doubt as to disability."  *Id.* (citing *Treichler*, 775 F.3d at 1101).  Even when all

28   three criteria are met, whether to make a direct award of benefits or remand for further

proceedings is within the district court's discretion. *Id.* (citing *Treichler*, 775 F.3d at 1101).

## II.     Disability Benefits

A claimant is "disabled" under the Social Security Act if: (1) the claimant "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and (2) the impairment is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(A)-(B). The SSA regulations provide a five-step sequential evaluation process for determining whether a claimant is disabled. The claimant has the burden of proof for steps one through four and the Commissioner has the burden of proof for step five. *Tackett*, 180 F.3d at 1098.

The five steps of the inquiry are:

> 1. Is claimant presently working in a substantially gainful activity? If so, then the claimant is not disabled within the meaning of the Social Security Act. If not, proceed to step two. *See* 20 C.F.R. §§ 404.1520(b), 416.920(b).
>
> 2. Is the claimant's impairment severe? If so, proceed to step three. If not, then the claimant is not disabled. *See* 20 C.F.R. §§ 404.1520(c), 416.920(c).
>
> 3. Does the impairment "meet or equal" one of a list of specific impairments described in 20 C.F.R. Part 220, Appendix 1? If so, then the claimant is disabled. If not, proceed to step four. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).
>
> 4. Is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled. If not, proceed to step five. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).
>
> 5. Is the claimant able to do any other work? If so, then the claimant is not disabled. If not, then the claimant is disabled. *See* 20 C.F.R. §§ 404.1520(f), 416.920(f).

*Bustamante v. Massanari*, 262 F.3d 949, 954 (9th Cir. 2001). The ALJ has an affirmative duty to assist the claimant in developing the record at every step of the inquiry. *Tackett*, 180 F.3d at 1098 n.3.

In between the third and fourth steps, the ALJ must determine the claimant's Residual Functional Capacity ("RFC"). 20 C.F.R. § 404.1520(a)(4), (e). To determine the RFC, the ALJ considers the impact of the claimant's symptoms on his or her ability to meet the physical, mental, sensory, and other requirements of work. *Id.* § 404.1545(a)(4). The ALJ will evaluate all the claimant's symptoms and the extent to which these symptoms are consistent with evidence in the record. *Id.* The evidence can include the claimant's own statements about his or her symptoms, but such statements must be adequately supported by the record in order to establish a disability. *Id.* In order to determine whether the claimant's statements are adequately supported, the ALJ must first determine whether the claimant has a medical impairment that could reasonably be expected to produce his or her symptoms, and then must evaluate the intensity and persistence of the claimant's symptoms. *Id.* When evaluating intensity and persistence, the ALJ must consider all of the available evidence, including the claimant's medical history, objective medical evidence, and statements about how the claimant's symptoms affect him or her. *Id.* The ALJ cannot reject statements about the intensity and persistence of symptoms solely because no objective medical evidence substantiates the statements. *Id.* § 404.1529(c)(2). The ALJ must also consider factors relevant to the claimant's symptoms, such as the claimant's daily activities, the claimant's medications and treatment, any other measures the claimant uses to alleviate symptoms, precipitating and aggravating factors, and any other factors relevant to the claimant's limited capacity for work due to his or her symptoms. *Id.* § 404.1529(c)(3)(i)-(vii). After determining the RFC, the ALJ proceeds to steps four and five of the disability inquiry.

## ALJ'S DECISION

Plaintiff was represented by counsel at the hearing before the ALJ.[6] AR at 17. The ALJ heard testimony from plaintiff as well as from vocational expert Jeffrey S. Malmuth. No medical expert testified.

On December 11, 2015, the ALJ issued a decision finding that plaintiff was not disabled

---

[6] Plaintiff has different counsel representing her in this appeal.

within the meaning of the Social Security Act. In determining plaintiff's disability status, the ALJ first established that plaintiff's Date Last Insured, or the last date of plaintiff's insured status, was December 31, 2014. *Id.* at 19. The ALJ then applied the five-step disability analysis set forth by 20 C.F.R. § 404.1520(a). *Id.* at 18. At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity from January 1, 2009, the onset date alleged by plaintiff, through her Date Last Insured. *Id.* at 19. At step two, the ALJ found that plaintiff suffered severe impairment from major depressive disorder and anxiety/PTSD. *Id.* At step three, the ALJ found that plaintiff's impairments did not meet or equal the severity of any impairment in the Listing of Impairments, including Listings 12.04 (affective disorders) or 12.06 (anxiety disorders). *Id.* at 20.

Before proceeding to step four, the ALJ examined plaintiff's RFC. In assessing plaintiff's RFC, the ALJ evaluated plaintiff's testimony and the medical evidence and weighed the opinions of plaintiff's treating practitioners, the consultative examiner, and the agency non-examining physicians. Specifically, the ALJ gave significant weight to the opinion of consultative psychological examiner Dr. Spivey. *Id.* at 23. The ALJ gave some weight to the opinions of the state agency physicians Drs. Koretzky and Covey. *Id.* at 24. The ALJ gave little weight to the February 2015 Mental Impairment Questionnaire completed by plaintiff's providers Ms. Coulter and Dr. Sangani. *See id.* As to plaintiff's own testimony, the ALJ determined that plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but found that plaintiff's testimony regarding the symptoms' severity was not entirely credible. *Id.* at 22. In light of the above assessment, the ALJ found plaintiff had the RFC "to perform a full range of work at all exertional levels but with the following nonexertional limitations: she can have no contact with the general public, and no more than occasional interaction with co-workers. She is limited to simple, repetitive tasks." *Id.* at 21.

Continuing to step four, the ALJ relied on testimony from the vocational expert ("VE") to find that plaintiff was unable to perform past relevant work. *Id.* at 24. At step five, the ALJ also relied on testimony from the VE to find that jobs existed in significant numbers in the national economy that plaintiff could perform, and therefore a finding of "not disabled" was appropriate. *Id.* at 25.

**DISCUSSION**

Plaintiff argues that the ALJ erred in discrediting plaintiff's testimony by failing to provide specific, clear and convincing reasons based on substantial evidence in the record. Second, she contends the ALJ erred in evaluating medical opinion testimony, particularly in rejecting the opinions of treating psychiatrist Dr. Purvi and therapist Ms. Coulter. Plaintiff also charges that the ALJ failed to develop the record, failed to consider records dated after the Date Last Insured, and failed to include all of plaintiff's limitations in the hypothetical presented to the vocational expert. Plaintiff requests the Court remand this case for an immediate award of benefits. Defendant contends that substantial evidence supports all of the ALJ's findings and conclusions. Defendant further contends that if the Court finds error, it should remand to the agency for further review rather than immediately award benefits.

## I.    Plaintiff's Symptom Testimony

Plaintiff first contends that the ALJ improperly discounted her testimony about symptom severity without providing specific, clear and convincing reasons supported by substantial evidence in the record.

The Ninth Circuit has established a two-step analysis for determining how to credit a claimant's symptom testimony:

> First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged. . . .
>
> If the claimant satisfies the first step of this analysis, and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so. This is not an easy requirement to meet: The clear and convincing standard is the most demanding required in Social Security cases.

*Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017) (quoting *Garrison*, 759 F.3d at 1014-15). If the ALJ finds the claimant's allegations of severity are not credible, "[t]he ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that

United States District Court
Northern District of California

conclusion." *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996). "These findings, properly supported by the record, must be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding pain." *Bunnell v. Sullivan*, 947 F.2d 341, 345-46 (9th Cir. 1991) (internal quotation marks and citation omitted).

At the first step of the credibility test, the ALJ found that plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms[.]" AR at 22. The ALJ cited no evidence of malingering. Moving to the second step, the ALJ found plaintiff's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible . . . ." *Id.* The ALJ explained that, "apart from presenting with a depressed affect and mood, her mental status examinations indicated unremarkable findings," pointing as an example to the treatment notes of Elizabeth Colt, L.C.S.W., in February 2009, December 2009, and March 2010. *Id.* at 22-23. The ALJ also cited to the three-year gap in the treatment records, from March 2010 to April 2013, and the fact that plaintiff declined medication. *Id.* at 23. In addition, the ALJ found

> it significant that the claimant testified she actively sought work after her termination in 2008, which suggests she believed herself capable of working and did not consider herself disabled from all work. I also note that while the claimant endorsed far greater limitations during her hearing testimony than in her October 2013 Function report (Exhibit 3E), her treatment records do not corroborate her testimony. *See, e.g.*, Exhibit 1F/29 (reports attending church regularly as of April 2013).

*Id.*

The Court agrees with plaintiff that, for a number of reasons, the ALJ erred in rejecting plaintiff's symptom testimony. As a threshold matter, the ALJ never identified which statements of plaintiff's he was rejecting. He apparently rejected all of plaintiff's testimony wholesale, stating, "In the present case, the claimant's testimony at the hearing is not fully supported by the medical evidence." *See id.* at 22. This circuit "require[s] the ALJ to specify which testimony she finds not credible . . . ." *See Brown-Hunter v. Colvin*, 806 F.3d 487, 489 (9th Cir. 2015). The failure to do so is not harmless error "because it precludes [the court] from conducting a

meaningful review of the ALJ's reasoning." *Id.* In her brief, defendant provides reasons for the ALJ's rejection of plaintiff's testimony that the ALJ himself did not provide. *See* Def.'s Cross-Mot. at 5. This is precisely the sort of speculation that the Court is to avoid on judicial review: "If the ALJ fails to specify his or her reasons for finding claimant testimony not credible, a reviewing court will be unable to review those reasons meaningfully without improperly substituting our conclusions for the ALJ's, or speculating as to the grounds for the ALJ's conclusions." *See Brown-Hunter*, 806 F.3d at 492 (internal quotation marks, alterations, and citation omitted). For this reason alone, the ALJ's treatment of plaintiff's symptom testimony cannot stand.[7]

As to the reasons the ALJ provided, many of them are not clear and convincing. For instance, there is nothing inconsistent about plaintiff reporting greater symptoms at the administrative hearing in November 2015 than she did in a functional report completed more than two years earlier, in October 2013. *See* AR at 23. The ALJ stated that "her treatment records do not corroborate her testimony" but cited only to an April 2013 note reporting regular church attendance. *See id.* A review of the entire record shows an overall trend of plaintiff's symptoms worsening with time. *See, e.g., id.* at 317 (diagnosing plaintiff with "depression, major, single episode" in November 2009), 409-10 (diagnosing plaintiff with "major depression, recurrent" and PTSD in November 2014). It is therefore possible that plaintiff was truthful in her report of symptoms in the October 2013 report as well as at the administrative hearing.

The ALJ relied heavily on what he characterized as "unremarkable" mental status

---

[7] At one point, the ALJ stated the following: that in April 2013 "the claimant sought treatment for depression, and reported that she continued to experience distress related to her 2008 termination. Exhibit 1F/29. However, the claimant also reported that she attends church regularly and could talk to friends and her husband for support." AR at 23. If the specific statements that the ALJ was discrediting were the statements that she was depressed and continued to experience distress related to her termination, the ALJ failed to provide clear and convincing reasons to discredit those statements. Church attendance and talking to friends and one's spouse are not inconsistent with claims of depression and distress. *See Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) ("The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits . . . and many home activities are not easily transferable to what may be the more grueling environment of the workplace . . . ."); *see also Popa v. Berryhill*, 872 F.3d 901, 906-07 (9th Cir. 2017) (analyzing the claimant's activities of grocery shopping, TV watching, and weekly church attendance in the past).

examinations but did not discuss further the underlying treatment notes and diagnoses, all of which consistently document a woman who cites her termination from her last job as a traumatizing event that triggered depression, resulting in her having difficulty leaving her home or trusting people. *See id.* at 22-23. In *Ghanim v. Colvin*, 763 F.3d 1154, 1164 (9th Cir. 2014), the Ninth Circuit found that the ALJ improperly rejected the symptom testimony of a claimant who reported depression and social anxiety. The ALJ "improperly cherry-picked some of [the examining physician's] characterizations of Ghanim's rapport and demeanor instead of considering these factors in the context of [the physician's] diagnoses and observations of impairment." *Ghanim*, 763 F.3d at 1164. The ALJ also "cited treatment notes that discussed Ghanim's 'good eye contact, organized and logical thought content, and focused attention.'" *Id.* The court found that "[t]hese observations of cognitive functioning during therapy sessions do not contradict Ghanim's reported symptoms of depression and social anxiety." *Id.*

Likewise here, the ALJ relied on indicators from plaintiff's mental status examinations that plaintiff had "a pleasant and cooperative demeanor, logical thought process, normal attention and concentration, and good impulse control, insight, and judgment." *See* AR at 22-23. Yet the mental status examinations also described plaintiff varyingly as tearful, with a depressed and sad mood and affect, guarded/hostile, anxious, withdrawn, and terse. *See, e.g., id.* at 313, 326, 334, 362, 393. Presenting as "pleasant and cooperative" is not inconsistent with allegations of depression, particularly where, as here, every clinician who treated or examined her diagnosed plaintiff with depression, PTSD, and/or anxiety disorder. *See Ghanim*, 763 F.3d at 1164 ("the treatment records must be viewed in light of the overall diagnostic record"); *see also Regennitter v. Comm'r of Soc. Sec. Admin.*, 166 F.3d 1294, 1299 (9th Cir. 1999) (finding examining expert's diagnoses of major depression, panic disorder, PTSD, and nightmare disorder were not inconsistent with what ALJ characterized as "benign Mental Status Exam" where expert did not call the exam benign and where exams noted claimant "to be tearful and sad, with a monotone and hypophonic voice and psychomotor retardation" and noted "blunted affect and uncontrolled crying"). Essentially, the ALJ discounted plaintiff's testimony that she was depressed on the basis of mental status exams by providers who simultaneously diagnosed plaintiff with clinical

depression. This was error.

The ALJ also pointed to plaintiff's denials of suicidal ideation as a reason to discredit her testimony. AR at 23. Yet the record shows that plaintiff consistently denied suicidal ideation, except for an urgent crisis visit in August 2013. Despite the lack of suicidal ideation, all of her treating and examining doctors and therapists over the course of more than five years diagnosed her with major depression, anxiety disorder, and/or PTSD. *See, e.g., id.* at 311, 319, 332, 345, 361, 407. The ALJ's conclusion that denials of suicidal ideation were inconsistent with plaintiff's alleged symptoms is therefore not supported by substantial evidence in the record, where so many clinicians also noted a lack of suicidal ideation but still diagnosed plaintiff with major depression.

Finally, the ALJ cited to the fact that plaintiff declined medication and further found "it significant that the claimant testified she actively sought work after her termination in 2008." *Id.* at 23. Without further information, however, the Court cannot conclude that either of these constitutes a clear and convincing reason to reject plaintiff's symptom testimony. The notes indicate that plaintiff gave her reasons for not wanting medication as a fear of addiction, "because of the stigma mental health has in her family and African American community[,]" because she heard of people becoming suicidal on medication, and because "[s]he has seen what drugs can do to people in her family." *Id.* at 353, 365, 424. In *Trevizo*, the Ninth Circuit found that the ALJ erred by weighing the claimant's failure to take prescribed painkillers against her credibility regarding elbow pain without addressing whether her stated reason for not taking the drugs—her fear of addiction—was believable. *See Trevizo*, 871 F.3d at 679-80. So too here. Nor is plaintiff's job search following her termination a clear and convincing reason. The ALJ questioned her about this but did not elicit any testimony about when she began her search and when she stopped looking. *See* AR at 38-40. Plaintiff does not allege a disability onset date until January 1, 2009, and it is possible she stopped her job search before that date. The ALJ had a duty to develop the record in this regard prior to using this information to discredit plaintiff's testimony. *Cf. Smolen*, 80 F.3d at 1288 (ALJ improperly rejected physician's opinions where ALJ failed to fully develop the record regarding basis for the opinions).

In sum, the ALJ failed to provide specific, clear and convincing reasons to reject plaintiff's

symptom testimony.  Such error was not harmless.[8]

## II.    Medical Opinions

Plaintiff contends the ALJ erred in evaluating medical opinion testimony, particularly in weighing the opinions of treating psychiatrist Dr. Sangani and therapist Cheri Coulter.[9]  Plaintiff contends that the ALJ failed to provide clear and convincing reasons, or even specific and legitimate reasons, for rejecting them.  Pl.'s Mot. at 9-10.  Plaintiff also argues the ALJ erred in favoring the opinions of the non-examining state agency physicians over plaintiff's treating providers.  *Id.* at 11-12.

In this circuit, courts distinguish among the opinions of three types of physicians: (1) treating physicians who have an established relationship with the claimant; (2) examining physicians who see the claimant but do not treat her; and (3) non-examining physicians who neither examine nor treat the claimant.  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  Generally, the opinion of a treating physician should be given greater weight than that of an examining or non-examining physician.  *Id.*  Similarly, an examining physician's opinion usually should be given more weight than that of a physician who has not examined the claimant.  *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).

For claims filed before March 27, 2017, such as plaintiff's, "[t]he medical opinion of a claimant's treating physician is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record.'"  *Trevizo*, 871 F.3d at 675 (quoting 20 C.F.R. § 404.1527(c)(2)).  As such, the ALJ must provide clear and convincing reasons to reject

---

[8] The ALJ also noted the three-year gap in plaintiff's treatment records but did not cite that as a reason for discrediting plaintiff's testimony.  *See* AR at 22.  Because the ALJ did not rely on that gap to discredit plaintiff, the Court does not address whether that would provide a clear and convincing reason.  Nor does the Court reach plaintiff's argument that the ALJ had a duty to develop the record as to why she was out of treatment during that time.

[9] Plaintiff mistakenly refers to Dr. Sangani at times as "S. Purvi," "Dr. Purvi," and "Dr. Sagani."  *See* Pl.'s Mot. at 8, 10.

the uncontradicted opinion of a treating or examining physician. *Lester*, 81 F.3d at 830. Even where an examining physician's opinion is contradicted by another physician's opinion, an ALJ may not reject the opinion without "specific and legitimate reasons that are supported by substantial evidence" in the record. *Garrison*, 759 F.3d at 1012; *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998). "This is so because, even when contradicted, a treating or examining physician's opinion is still owed deference and will often be 'entitled to the greatest weight . . . even if it does not meet the test for controlling weight.'" *Garrison*, 759 F.3d at 1012 (quoting *Orn v. Astrue*, 495 F.3d 625, 633 (9th Cir. 2007)). Social Security regulations provide that, when a treating source's opinions are not given controlling weight, an ALJ must apply the factors in 20 C.F.R. § 404.1527(c)(2)(i-ii) (length of treatment relationship and the frequency of examination; nature and extent of the treatment relationship) and (c)(3-6) ("supportability," consistency, specialization, and other factors that tend to support or contradict the opinion) in determining how much weight to give each opinion. *Id.* at 1012 n.11.

The "substantial evidence" standard requires an ALJ to "set[] out a detailed and thorough summary of the facts and conflicting clinical evidence, stat[e] his interpretation thereof, and mak[e] findings." *Reddick*, 157 F.3d at 725. Conclusory statements by the ALJ are insufficient; he "must set forth [his or] her own interpretations and explain why they, rather than the doctors', are correct." *Id.* An ALJ errs if he "does not explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over another[.]" *Garrison*, 759 F.3d at 1012-13 (citing *Nguyen v. Chater*, 100 F.3d 1462, 1464 (9th Cir. 1996)).

### A.    Treating Providers

In determining the RFC, the ALJ found, as to the opinion of plaintiff's treating therapist Ms. Coulter:

> I accord little weight to the November 2014 assessment by the claimant's current therapist, Cheri Coulter, LCSW. Exhibit 7F. I note that Ms. Coulter did not begin treating the claimant until November 2014, a month prior to the date last insured, and at that time the claimant reported "doing okay." (Exhibit 9F/3). Ms. Coulter has no basis of knowledge for her assessment that the claimant has been so seriously impaired since 2008. Moreover, Ms.

Coulter reported that the claimant sounded less depressed, and denied suicidal ideation. *Id.*/8. Similar to other providers, Ms. Coulter assessed the claimant with a GAF score in the range of 51-60. *Id.*; *see also id.*/12. Ms. Coulter's assessment, which opines that the claimant has "marked" limitations in several functional areas, is neither supported by her treatment notes, nor is it supported by the claimant's earlier records prior to the date last insured. For similar reasons, I accord little weight to Ms. Coulter's opinion that the claimant's condition precludes her from working. Exhibits 6F; 8F. Even if the claimant's 2015 treatment records were to show worsening symptoms, they reflect circumstances after the claimant's date last insured.[1]

. . .

[1] I note that in March 2015 Ms. Coulter assessed a GAF score of 21-30, despite an essentially normal mental status exam, and despite the lack of any other evidence indicating such grave impairment in function.

AR at 24.

As an initial matter, the Court notes that the ALJ failed to recognize that the Mental Impairment Questionnaire, completed on February 19, 2015, was co-signed by Dr. Sangani, a treating psychiatrist. (The ALJ erroneously referred to the Mental Impairment Questionnaire as "the November 2014 assessment by the claimant's current therapist, Cheri Coulter, LCSW." *See id.*) The ALJ did not address Dr. Sangani's opinion at all in his decision, though it is apparent from the decision that the ALJ rejected Dr. Sangani's opinion as stated in the February 2015 questionnaire. By failing to address Dr. Sangani's opinion whatsoever, the ALJ by extension failed to provide legally sufficient reasons for rejecting it. *See* 20 C.F.R. § 404.1527(c) ("Regardless of its source, we will evaluate every medical opinion we receive."). Dr. Sangani's opinion was entitled to controlling weight as long as it was "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [was] not inconsistent with the other substantial evidence in [plaintiff's] case record.'" *See Trevizo*, 871 F.3d at 675 (quoting 20 C.F.R. § 404.1527(c)(2)). If the ALJ wished to reject Dr. Sangani's opinion, he was to do so after applying the factors listed in 20 C.F.R. § 404.1527(c)(2)-(6) and after providing specific and legitimate reasons supported by substantial evidence in the record.[10] *See id.*

[10] The "specific and legitimate reasons" standard, rather than the higher "clear and convincing reasons" standard, is appropriate here because Dr. Sangani's findings of marked

Ms. Coulter, by contrast, as a treating therapist, is not considered an "acceptable medical source" under the Social Security regulations. *See Ghanim*, 763 F.3d at 1161. "Although mental health counselors and social workers are not 'acceptable medical sources,' 20 C.F.R. § 404.1513(a), they are 'other sources' under 20 C.F.R. § 404.1513(d), and the ALJ may only disregard their testimony if he or she 'gives reasons germane to each witness for doing so.'" *Kelly v. Astrue*, 471 F. App'x 674, 676 (9th Cir. 2012) (quoting *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1223-24 (9th Cir. 2010)). For several reasons, the Court finds the ALJ erred in assigning little weight to the opinion of Ms. Coulter.

First, the fact that Ms. Coulter began treating plaintiff in November 2014 was not a germane reason to discount her opinion. Although a claimant seeking benefits under Title II must prove she was disabled prior to the Date Last Insured, nothing in the Social Security regulations states that opinions offered in the month prior to the Date Last Insured should be disregarded. Plaintiff had five appointments with Ms. Coulter before December 31, 2014, more than any other previous provider. *See AR* at 405, 409, 411, 413, 415. It also makes little sense for the ALJ to use this as a basis for rejecting a therapist's opinion while simultaneously affording greater weight to a practitioner who examined plaintiff only once (i.e., Dr. Spivey) and the state agency consultants who never met plaintiff.

Similarly, defendant provides no authority for her argument that Dr. Sangani and Ms. Coulter's opinions should not be credited because Ms. Coulter began treating plaintiff in November 2014, the month before plaintiff's Date Last Insured. *See* Def.'s Cross-Mot. at 8. Defendant states, "the ALJ properly discounted any statements regarding Plaintiff's medical condition by Ms. Coulter and Dr. Sangani prior to the time they treated her, as they would not have direct knowledge of Plaintiff's condition from 2009-2014." *Id.* If the Court were to credit this argument, then the Court would also have to disregard any opinion testimony from

limitation in daily living and social functioning are contradicted by the opinions of Drs. Spivey, Koretzky, and Covey, none of whom found marked limitations in any areas of functioning. Plaintiff provides no support for her argument that, simply because the state agency doctors rendered their opinions over a year before Dr. Sangani did, it follows that Dr. Sangani's opinion was uncontradicted. *See* Pl.'s Mot. at 10.

consultative and non-examining providers, whose knowledge of plaintiff's history was even more indirect. This is clearly not the state of the law. Rather, the Social Security regulations specify how the ALJ should weigh a medical opinion, considering factors such as the nature of the treatment relationship, the length of the relationship and frequency of examination, the supportability and consistency of the opinion, and whether the opinion comes from a "specialist about medical issues related to his or her area of specialty . . . ." *See* 20 C.F.R. § 404.1527(c).[11]

Similarly, it was error for the ALJ to entirely disregard treatment records post-dating the Date Last Insured, such as Ms. Coulter's January 16, 2015 letter. *See* AR at 24. The "significant date for disability compensation is the date of onset of the disability rather than the date of diagnosis." *Morgan v. Sullivan*, 945 F.2d 1079, 1081 (9th Cir. 1991); *see also* SSR 83-20, 1983 WL 31249, at *1 ("Although important to the establishment of a period of disability and to the payment of benefits, the expiration of insured status is not itself a consideration in determining when disability first began.").[12] The ALJ's decision must be supported by substantial evidence, or "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Molina*, 674 F.3d at 1110. To the extent that there is evidence, including opinion evidence, in the record that post-dates the Date Last Insured, it may still bear on the question of the date of onset of disability, and the ALJ therefore should have considered it. *See Quarles v. Barnhart*, 178 F. Supp. 2d 1089, 1097 (9th Cir. 2001) (Hamilton, J.) (finding the ALJ erred in discounting evidence "on the basis that the psychiatric evaluation occurred nearly two years after the DLI," explaining, "That the evaluation did not take place until 1997 does not mean that the onset did not occur before the DLI").

The ALJ also discounted Ms. Coulter's opinion based on Ms. Coulter's notes from certain appointments that plaintiff "sounded less depressed, and denied suicidal ideation." AR at 24. As explained above, plaintiff consistently denied suicidal ideation but received diagnoses of major

---

[11] 20 C.F.R. § 404.1527 applies to claims, such as plaintiff's, filed before March 27, 2017.

[12] Although SSRs (Social Security Rulings) do not have the same force and effect as statutes or regulations, they are binding on all components of the Social Security Administration, including ALJs. *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1224 (9th Cir. 2009); *see also* 20 C.F.R. § 402.35(b)(1).

23

depression or PTSD from all of her care providers. The fact that plaintiff "sounded less depressed" on a few occasions does not mean that she was symptom-free or that she was not disabled. In *Ghanim*, the Ninth Circuit explained, "The fact that a person suffering from depression makes some improvement 'does not mean that the person's impairment no longer seriously affects his ability to function in a workplace.'" *Ghanim*, 763 F.3d at 1162 (internal alterations and citations omitted). For this reason, the appeals court found that "occasional indicia of improvement, a minimal capacity to perform basic chores, and some reliance by treating providers on Ghanim's self-reports . . . was not an adequate evidentiary basis to reject the opinions of a treating physician or other treating providers [therapists]." *Id.* at 1162-63. Likewise here, an occasional note that plaintiff "sounded less depressed" does not provide grounds for discounting an opinion where the treatment notes for those encounters diagnosed plaintiff with major depression and PTSD, noted that she feels like a failure, was unable to talk about her termination from six years prior "without crying and feeling overwhelmed," and reported anger, humiliation, and shame. AR at 411-14.[13]

Nor was the fact that Ms. Coulter at times assigned a Global Assessment of Function ("GAF") score of 51-60 a germane reason, particularly where that score was, as the ALJ noted, consistent with that noted by other providers. *See id.* at 24. The Ninth Circuit has cautioned that although "they may be a useful measurement[,] . . . GAF scores are typically assessed in controlled, clinical settings that may differ from work environments in important respects." *See Garrison*, 759 F.3d at 1002 n.4. Without more, the Court cannot conclude that the GAF score Ms. Coulter assigned at any specific visit contradicts her other conclusions regarding plaintiff's level of functioning. *See id.* at 1018, 1023 (remanding for award of benefits to a claimant whose "diagnoses of PTSD and bipolar disorder remained constant across all treatment records" and whose "GAF score consistently hovered around 50 to 55").

Defendant argues that the ALJ did not need "to accept each and every limitation by a medical provider." Def.'s Cross-Mot. at 11. Although it may be true that the ALJ did not need to

---

[13] Of course, "less depressed" is also a relative term and could serve to indicate that plaintiff typically sounded severely depressed, for instance.

accept every limitation, the ALJ needed to provide specific and legitimate reasons for rejecting Dr. Sangani's opinion and germane reasons for rejecting Ms. Coulter's opinion. The ALJ did not do so. This is particularly important where Ms. Coulter and Dr. Sangani concluded that plaintiff had marked limitations in daily living and social functioning, would be absent or unable to complete a work-day at least four times per month, and had an impairment that lasted or would be expected to last at least twelve months. *See* AR at 402-03.

### B.    Consultative Examiner

In determining plaintiff's RFC, the ALJ accorded "significant weight to the assessment of consultative psychological examiner Dr. Patricia Spivey." *Id.* at 23. Plaintiff argues that Dr. Spivey's report does not support the ALJ's non-disabled finding. Pl.'s Mot. at 10.

The Court agrees that the ALJ did not properly support the weight the ALJ assigned to Dr. Spivey's report. After explaining Dr. Spivey's opinion, the ALJ wrote, "Dr. Spivey's assessed limitations are generally consistent with the treatment records, as discussed above, and are consistent with the claimant's residual functional capacity assessment." AR at 23. It thus appears that the ALJ weighed Dr. Spivey's opinion more heavily because it comported with the RFC that the ALJ assigned. This was error. The ALJ is charged with evaluating the medical evidence and then using that to determine the RFC, not the other way around. *Cf. Revels v. Berryhill*, 874 F.3d 648, 666 (9th Cir. 2017) ("The ALJ took a backward approach to determining [the claimant's] credibility. . . . To determine the RFC *first* and *then* assess the claimant's testimony is to 'put[] the cart before the horse.'") (quoting *Laborin v. Berryhill*, 867 F.3d 1151, 1154 (9th Cir. 2017)).

Taken together with the ALJ's inadequate support for discounting the treating providers' opinions, as explained above, the ALJ's treatment of Dr. Spivey's opinion additionally weighs in favor of reversal.

### C.    Non-Examining Doctors

Finally, the ALJ accorded "some weight" to the evaluations of the state agency psychological consultants, Drs. Koretzky and Covey. Plaintiff argues that the ALJ erred in

favoring these opinions over those of plaintiff's treating providers.  Pl.'s Mot. at 11.

In the decision, the ALJ noted that Drs. Koretzky and Covey "opined that the claimant could perform simple, repetitive tasks, and that she could have only superficial interaction with co-workers, as well as infrequent interaction with the general public."  AR at 24.  The ALJ gave his reason for assigning these opinions "some weight" as follows: "Their opinions are supported by the claimant's underlying treatment records, including evidence that the claimant presented, at times, with a hostile and guarded demeanor."  *Id.*

Substantial evidence does not support the ALJ's reasons for favoring the opinions of two non-examining doctors over the opinions of plaintiff's treating providers.  First, the ALJ relied in part on consistency with the treatment records as a reason to favor the non-examining doctor opinions and yet discounted the conclusions that the treating providers themselves reached.  Additionally, Drs. Koretzky and Covey's conclusion that plaintiff could perform simple, repetitive tasks is consistent with the conclusion of Ms. Coulter and Dr. Sangani, who opined that plaintiff was not limited in her ability to carry out very short and simple instructions and had limited but satisfactory ability to understand and remember very short and simple instructions and to make simple work-related decisions.  *See id.* at 400.  Moreover, the fact that the treatment records at times noted plaintiff's "hostile and guarded demeanor" is not a reason to favor the opinions of Drs. Koretzky and Covey that plaintiff could have superficial interaction with co-workers and infrequent interaction with the public.  Plaintiff's hostile demeanor could just as well support the treating providers' conclusions that plaintiff was "seriously limited, but not precluded" in her ability to get along with co-workers or peers and was unable to meet competitive standards in her ability to interact with the general public.  *See id.* at 400-01.

In sum, the ALJ erred by failing to "set forth specific, legitimate reasons for crediting" the medical opinions of the examining and non-examining doctors over that of plaintiff's treating providers.  *See Garrison*, 759 F.3d at 1012.

### III.    Onset Date

Plaintiff argues that the ALJ erred by making an unsupported lay inference as to the onset

date of her disability, and that the ALJ should have called a medical advisor to opine on this point. Pl.'s Mot. at 14-15.

Although the ALJ did not make a specific finding as when any onset of disability occurred, the ALJ found that there was no onset before December 31, 2014. For this reason, the ALJ refused to consider medical records dated after the Date Last Insured. *See* AR at 24 & n.1.

The Ninth Circuit has explained:

> The significant date for disability compensation is the date of onset of the disability rather than the date of diagnosis. [Citations] Mental disorders may manifest themselves over a period of time. Consequently, the precise date of onset of a disabling psychological impairment may be difficult, or impossible, to ascertain, and the services of a specialist may be necessary to infer the onset date.

*Morgan*, 945 F.2d at 1081. For this reason, the Ninth Circuit has held that "[i]f the medical evidence is not definite concerning the onset date and medical inferences need to be made, SSR 83-20 requires the administrative law judge to call upon the services of a medical advisor and to obtain all evidence which is available to make the determination." *Armstrong*, 160 F.3d at 590 (quoting *DeLorme v. Sullivan*, 924 F.2d 841, 848 (9th Cir. 1991) (internal quotation marks omitted)). Courts in this circuit have remanded cases for further proceedings even where the mental health records were dated after the Date Last Insured. *See, e.g., Morgan*, 945 F.2d at 1081-83 (remanding for the ALJ to determine the onset date with the assistance of a medical advisor, where Date Last insured was December 31, 1979, and first record of mental health impairment was in January 1980).

In *Quarles*, for instance, Judge Hamilton of this district found that the ALJ "erred as a matter of law when he did not call a medical advisor, but instead inferred, based on the dates of medical treatment, that the onset date of Quarles' 'currently establishe[d] severe emotional disorders' was not prior to Quarles' DLI." *Quarles*, 178 F. Supp. 2d at 1096. The claimant's Date Last Insured was December 31, 1995, and there were no treatment records for her alleged disabling conditions through the Date Last Insured, save for two months of treatment in 1994. *Id.* at 1092. The ALJ found that Quarles was not disabled prior to the Date Last Insured, and a "key factor" in that decision, according to the court, "was the lack of medical evidence for the period

from the onset date [the claimant alleged] to Quarles' date last insured, December 31, 1995." *Id.* at 1094. Judge Hamilton reversed the denial of disability benefits and remanded for a determination made with the assistance of a medical advisor regarding the claimant's onset date. Relying on Ninth Circuit precedent and SSR 83-20, Judge Hamilton explained that "where medical inferences regarding the onset date need to be made, the ALJ *must* consult a medical expert before determining the onset date." *Id.* at 1096.

Plaintiff's case here is somewhat different in that there are a number of medical records diagnosing plaintiff with depression and anxiety disorder prior to her Date Last Insured. Nevertheless, it is clear that the ALJ confused the date of onset of disability with the Date Last Insured and improperly excluded any evidence issued after the Date Last Insured, even if it was relevant to a determination as to onset date. *See* AR at 24 & n.1. As already noted, the medical record reflects that plaintiff's symptoms of depression, anxiety, and PTSD grew worse over time. Although it was not until January 2015 (and then again in February 2015) that a provider definitively asserted that plaintiff was disabled by her diagnoses, plaintiff's "depression could have been disabling long before that time." *See Armstrong*, 160 F.3d at 590. Because the record is unclear on this point, the Court agrees with plaintiff that the ALJ erred both in failing to consider medical records past the Date Last Insured and in failing to call a medical advisor regarding the date of onset of disability.

## IV. Remedy

Plaintiff seeks remand for an immediate award of benefits under the credit-as-true rule. Pl.'s Mot. at 16-17. The Ninth Circuit has explained that this remedy "was intended as a rare and prophylactic exception to the ordinary remand rule when there is no question that a finding of disability would be required" if the medical opinion or claimant's testimony were credited as true. *See Leon*, 880 F.3d at 1045 (citing *Treichler*, 775 F.3d at 1101). Here, the Court will not exercise its discretion to direct immediate payment of benefits. Although there are numerous records documenting plaintiff's diagnosed depression and PTSD, including findings from plaintiff's treating providers that plaintiff was disabled, the ambiguity of the onset date warrants remand.

Because "further administrative proceedings would be useful," the Court will not order an immediate award of benefits but will remand this case for further proceedings consistent with this Order. *See id.* (citations omitted).

To summarize, on remand, the ALJ shall:

- **Reweigh the credibility of plaintiff's symptom testimony.** If the ALJ rejects any portions of plaintiff's symptom testimony, the ALJ shall identify what testimony the ALJ finds not credible and provide specific, clear and convincing reasons supported by substantial evidence in the record for rejecting that testimony.

- **Reweigh the medical opinions**, in particular those of Dr. Sangani, Ms. Coulter, Dr. Spivey, and Drs. Koretzky and Covey. If the ALJ finds that Dr. Sangani's opinion is not controlling, the ALJ shall weigh the opinion by applying the factors listed in 20 C.F.R. § 404.1527(c)(2)-(6). Any opinions of Dr. Sangani that the ALJ rejects must be specifically identified and rejected with specific and legitimate reasons supported by substantial evidence in the record. Any opinions of Ms. Coulter that the ALJ rejects must be rejected with germane reasons. The ALJ shall not exclude consideration of records solely because they post-date the Date Last Insured.

- **Call a medical advisor** regarding plaintiff's onset date.

- **Revisit the five-step inquiry**, starting with step three.[14] If the ALJ finds plaintiff is not disabled at step three, then the ALJ shall proceed to reevaluate plaintiff's RFC and shall revisit step five.[15]

_____

[14] A reevaluation of step three is needed because the ALJ found plaintiff did not meet a listed impairment based on the ALJ's discounting of plaintiff's symptom testimony, which the Court herein finds was improperly discounted. *See* AR at 20-21. Further, the ALJ might have found that plaintiff did meet the paragraph B criteria of Listings 12.04 and 12.06 if he properly considered the opinions of Dr. Sangani and Ms. Coulter, who found marked limitations in daily activities and social functioning. *See id.* at 20 (explaining that paragraph B criteria requires at least two of the following: marked restriction of activities of daily living, marked difficulties in maintaining social functioning, and marked difficulties in maintaining concentration, persistence, or pace), 402.

[15] Because the Court is remanding this case for further proceedings, which necessarily will result either in a finding that plaintiff is disabled or in a reevaluation at step five, the Court does not separately address plaintiff's various arguments that the ALJ erred at step five by failing to include all the limitations that Dr. Spivey and/or plaintiff's treating providers noted in the

29

**CONCLUSION**

The Court GRANTS IN PART and DENIES IN PART plaintiff's motion for summary judgment, and DENIES defendant's cross-motion for summary judgment. The Court REVERSES the decision of the Commissioner and REMANDS this case pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Order.

**IT IS SO ORDERED**.

Dated: September 19, 2018

_____
SUSAN ILLSTON
United States District Judge

United States District Court
Northern District of California

hypothetical the ALJ posed to the vocational expert.